Nicholson, C. J.,
delivered tlie opinion of the court:
The Tennessee National .Bank of Memphis filed this bill to have the title to. lot No. 256, in Memphis, known as the Telegraph Building, divested out of ¥m G. Ford and Mary S. Ford, his wife, and vested in the bank. The facts on vhich the questions to- he determined arise, so far as it is necessary to state them, are- as follows:
The Tennessee National Bank of Memphis was organized at Memphis in 1865, under the general banking laws, with a capital of $100,000, with Geo. B. Butler as its president. On the 7th of September, 1866, the board of directors, by resolution, authorized their president to increase the capital stock to $500,000. In a few days Butler, the president, went to New York, and there made an arrangement with Vm. G. Ford, residing there, by which Ford subscribed for 1,035 shares of the stock of the hank, in payment o-f which he was to convey to the bank real estate worth $103,500.00. Butler signed and delivered to Ford four certificates of stock, each for 100 shares, making $40,000. On the same day, 17th of September, 1866, Ford conveyed to “Geo. E. Butler, president of the Tennessee National Bank of Memphis,” for the consideration of $40,000, with full warranty of title, lot No. 256, in Memphis, known as the Telegraph Building. The deed for the lot was duly registered in Shelby coünty.
*533 Ford came to Memphis about the 15th of December, 1866, and on that day returned the four certificates of stock to Rutler, -whereupon Rutler executed a deed conveying to Mary S. Ford, wife of W. G. Ford, for the expressed consideration of $40,000, lot Eb. 256, in Memphis, which deed is signed Geo. R. Rutler, president, etc., and was registered on the day of its execution.
The bank files the bill to set aside this deed for fraud, and as a cloud on the bank’s title.
It is clear that the legal title to the lot was not vested in the bank by the deed of Ford, executed on the 17th of September, 1866. The conveyance was to- Rutler, president of the Tennessee Rational Bank, at Memphis, and the warranty of the title was to Rutler, president, etc., and not to the bank. The legal title was therefore vested in Rutler, and if the bank had any title it was equitable.
The consideration for the lot was 400 shares of the stock of the bank, and as it is to fairly he presumed that this was new stock issued by Rutler, under the resolution passed a few days before, authorizing him to> increase the stock, we conclude that the lot was conveyed to Rutler for the bank, and, therefore, that the bank had an equitable title to it. If the bank continued to be the equitable owner of the lot at the time Rutler conveyed it to Ford’s wife, the bank might enforce its equitable title, as it is not pretended that Mrs. Ford was an innocent purchaser without notice.
But 'it is insisted for defendants that the subscription of the stock by Ford was not absolute, but was conditional, and that when Ford returned the certificates of stock to Rutler, he had a right to do so, and to demand a recon-veyance, because of Rut-ler’s failure to execute the conditional agreement, and, therefore, that when Rutler conveyed the lot to Mrs. Ford, the bank ceased to' have any title, legal or equitable. This must depend upon the facts as proven.
*534 The answer of Ford on oath was waived by complainant, but bis deposition' was afterwards taken -by complainant, in which he adopts his answer as part of his deposition. In his answer he says that some time in September, 186-6, Butler came to Hew York and proposed to him to subscribo for stock in the bank. He had known Butler in Hew York, where Butler had lived with him, and from his association with him he confided in his statement. He says Butler represented the bank as solvent and in good condition, and that it would make a dividend of $10 on the share on or about October 1st, 1866; that he greatly desired to own and control' some real estate for the bank, nominally and temporarily, in order to give confidence and credit to the bank; therefore, Ford says, he agreed if Butler would return to Memphis, reorganize the bank, secure the election and installation of Ben May as cashier, and write to him fully, giving a statement of the condition of the bank, etc., he would become a stockholder, and convey to the bank a large amount of real estate. He says that, however, upon faith of the representations of Butler, and of his confidence that Butler would comply with his promises, and that the arrangement wo-uld be consummated as he desired, he agreed to be conditionally a stockholdrer, and on the .lYth of September, 1866, Butler issued to him four certificates of stock for $10,000 each, and thereupon he conveyed to Butler, president, etc., the lot in controversy.
He says, further, that at the same time Butler executed in pencil the following paper: “The 1,035 shares of stock subscribed by W. G-. Ford is subscribed with the express understanding that it be and is left optionary with the. said Ford.to comply with the subscription. It is understood that he can withdraw this subscription of stock whenever it suits him to do so.” (Signed) Geo. B. Butler, Pres’t.
Ford further produced a deed executed by Butler at the same time conveying back to Ford, for the consideration of $40,000, the lot Ho. 256, reciting in the deed that the *535 consideration “is hereafter to be paid by Ford to Rutler by the surrender and delivery of four certificates of the Tennessee Rational Bank stock, each for $10,000, which have this day been signed and issued by said Geo. R. Rutler, president of said bank, to said Ford.”
In addition to all this, Ford proves that as part of the same transaction, Rutler, as president of the bank, executed to him an obligation in writing, binding himself to recon-vey said property to him, or his order, upon demand, and deliver to him (the said Rutler), of the $40,000 of bank stock certificates.
Fie concludes that the abject and intention of the parties in these transactions in Hew York was to make no binding and unconditional contract, but to leave the whole thing in abeyance, and at the. option of Ford, until the said Rut-ler had performed his promises in reference to reorganizing, etc., as already stated.
Such is the evidence of Ford, the defendant, examined as a witness by the bank. Flis testimony is uncontradicted by another witness, and its material features is sustained by the written evidences filed and established.
It exhibits a remarkable device on the part of Rutler 'to secure a temporary credit for his bank, by seeming to own $40,000 worth of real estate. It develops a singular-instance of implicit confidence on the part of Ford in Rut-lex, whereby he conveyed to him real estate worth $40,000, and thus put it in his power to sell it and pocket the proceeds, whereas, as far as this record shows, it had no other motive than to become a stockholder in the bank, but while he trusted Rutler with an apparently blind confidence with the title to his property in Memphis, he 'evinced a singular caution in guar-ding himself against being bound by his subscription of stock in the bank.
It is impossible to resist the conclusion that Ford was willing to aid Rutler- in his desire to own, temporarily, for his bank, valuable real- estate, to give credit 'to. the *536 institution, and to this extent he may be implicated in a fraudulent device, bnt we cannot see that this in any material degree detracts from the credit to be given to his evidence, corroborated, as it is, by written documents; nor do we see that anybody was deceived by the device, or that any damages was suffered thereby.
Upon the proof, we are bonnd to hold that Ford’s subscription of stock was upon condition, which Sutler failed to comply with; that the contract to subscribe for the stock and pay for it in real estate, was not an executed, but a conditional and executory contract, and, therefore that when Ford delivered up the certificates of stock, and took a conveyance of the lot to- his wife, he did no more than he had a right to do under his contract, and hence, that the bank therefore ceased to have any interest, legal or equitable, in the lot.
In this connection we may remark that it- may be fairly inferred from all the facts and circumstances, that in procuring Ford’s subscription Butler was taking steps to increase the capital of the bank to $500,000, as authorized by the board of directors, and that Ford’s subscription was intended to- be a part of this increased capital. But until the whole additional amount was subscribed and approved by the comptroller of the currency, Ford’s subscription was, by law, only binding upon the procurement of the residue of the additional stock. Until this was done, be could not withdraw his subscription. As the additional stock was never procured, Ford had a right to- surrender his subscription.
As these views of the case are conclusive, we are not called on to examine and discuss the various questions of law which might have arisen upon a different state of the facts, nor do we deem it necessary to notice that branch of the case in regard to the Arkansas land, as we do not understand that the decree of the chancellor is controverted as to that branch of the case.
*537 We are of opinion now, as we were on the former hearing of the canse, that the decree of the chancellor is correct, and we affirm it, with costs.
Opinion on petition for attorney’s lien.
This is an application by the solicitors of Mary S. Ford, wife of W. G-. Ford, to have a lien declared on a fund of $800 now in court, for their services in defending and securing to her the real estate out of which the fund has arisen.
The Tennessee National Bank of Memphis filed its bill against Ford and wife to have the title of Mrs. Ford to a valuabel house and lot in Memphis divested out of her and vested in the bank, upon the ground that it had belonged to the bank, and had been illegally and fraudulently conveyed to her by Butler, the president of the bank. Ford and wife were enjoined from interfering with the property by receiving and appropriating its rents, and a receiver was prayed for.
The case was heard at a former teína of this court-, when it was determined that the bank had no title to the property, but that it belonged to Mrs. Ford. A decree to this effect was rendered, in which a lien was declared in favor of her solicitors for their fees.
But upon a petition for rehearing, the decree was set aside, and the cause continued for rehearing. It was rer heard at the present term, when the court again determined that the bank had no right to the property, and now Mrs. Ford’s solicitors ask that their lien be again declared.
It appears from the report of the clerk of this court that the property has been sold under a decree of this court to satisfy a prior lien which existed on it when Mrs. Ford acquired her title, and that after satisfying this prior in-cumbrance there is in his hands about $800. It is this fund on which the solicitors seek to have their lien declared.
The question as to declaring liens in favor of attorneys *538 was considered at some length, in the case of Hunt v. McClanahan, 1 Heis., 503, when it was decided the same reasons exist for allowing such lien on lands in custody of this court in litigation as on a pecuniary fund under control of the court. The practice of declaring such liens on the recoveries in favor of the attorneys of plaintiff or complainants is well settled. It is' only when attorneys represent clients under some disability, such as married women and infants, that the courts make reference to ascertain and fix the fee. When the clients are sui juris, no more is done, than to declare the lien.
The present application is on behalf of the solicitors of a defendant and a married woman, and the question is whether it falls within the reason of the rule before stated. The litigation was as to the title to- a specific house and lot, which was brought under the custody of the court upon the filing of the bill.
The defendant, whose title was involved, was a married woman. The court decided that she was entitled to- hold the property. This result was secured by the professional sendees of her solicitors. We are unable to see why the solicitors are not as much entitled to be protected as if they had been representing the complainant, as the property recovered was in the custody of the court. The reason seems to us to operate as well in favor of solicitors of defendant as of complainant when the recovery is of property in the custody of the court.
The lien in such cases is declared to exist from the commencement of the litigation. It is true that the title of Mrs. Ford was incumbered with a prior lien. Of course this was superior to the lien of the solicitors, but as this prior lien has been satisfied, leaving a surplus of $800, which is in the custody of the court, we are of opinion that the lien of Mrs. Ford’s solicitors attached to this fund, and the same will be accordingly declared by a proper decree.